J-S24006-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA　:　IN THE SUPERIOR COURT OF
　　　　　　　　　　　　　　:　　　　　PENNSYLVANIA
　　　　　　　　　　　　　　:
　　　　　v.　　　　　　　　:
　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　:
CURTIS THOMAS　　　　　　　:
　　　　　　　　　　　　　　:
　　　　　Appellant　　　　　:　　No. 1537 EDA 2019

Appeal from the Judgment of Sentence Entered January 22, 2019
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s):  CP-39-CR-0005587-2017

BEFORE:　BENDER, P.J.E., STABILE, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.:　　　　　**FILED JULY 27, 2020**

Appellant, Curtis Thomas, appeals from the judgment of sentence of life imprisonment without the possibility of parole, and a consecutive term of 10-20 years' incarceration, imposed after he was found guilty of first-degree murder, fleeing or attempting to elude an officer, and two counts of persons not to possess a firearm.  After careful review, we affirm.

The trial court provided the following summary of the facts underlying Appellant's conviction.  Just before noon on November 1, 2017,

> David Roth was in his living room watching television when he heard screeching tires outside at the intersection of Wyoming and South 9th Streets in Allentown, Lehigh County, Pennsylvania.  Roth immediately looked out the window and saw a silver car—later determined to be an Acura—stopped on Wyoming [S]treet facing east[,] and a purple Honda Ridgeline stopped on South 9th Street facing south.  Roth saw the Acura's driver—later identified as Charles Hughes III—get out, walk around the front of his vehicle,

---

[*] Retired Senior Judge assigned to the Superior Court.

and look at the passenger side. He also saw a black male wearing black pants and a black hoodie walk from the side of the Honda into the intersection. Hughes appeared to be gesturing to the man from the Honda. Roth saw the man return to the Honda and go to the rear driver's door. The man then walked back to the intersection with a shotgun in his hand, pointed the gun at Hughes, and fired one shot. Hughes stumbled back and collapsed on the sidewalk. The man ran back to the Honda and drove away, heading south on South 9th street.

Another resident near the intersection, Kayla Espinal, was in her second-floor bedroom when she heard what sounded like a car crash outside. Espinal looked out the window and saw a purple truck with tinted back windows stopped on South 9th Street facing south just past the intersection with Wyoming Street. Espinal also observed the silver Acura parked on Wyoming Street facing east. She saw the truck's driver—a black male with dreadlocks wearing black pants, a black hoodie, and glasses—and the Acura's driver, Mr. Hughes, yelling at each other. After about 15 to 30 seconds, Espinal heard the truck's driver tell Hughes he had something for him, and saw him walk back to the truck and retrieve a shotgun. Espinal saw the man walk back towards Hughes while pointing the gun down. She saw the man move his hand along the gun and heard two click sounds. She then saw the man raise the gun and point it at Hughes. Espinal immediately closed her eyes and heard a gunshot. Espinal ran downstairs and looked outside. She saw Hughes lying on the sidewalk. The truck and shooter were gone.

Allentown Police responded to the area and found Mr. Hughes deceased on the sidewalk. After speaking with the witnesses, police broadcasted a description of the truck and shooter. Police also obtained surveillance video from a nearby business that showed a purple Honda Ridgeline traveling south on South 9th Street just minutes before the shooting. A horizontal white sticker could be seen in the bottom left corner of the back window of the Honda.

Approximately two hours later, in the area of 6th and Walnut Streets, Allentown Police observed a purple Honda Ridgeline with a white sticker on the driver's side rear window. Officers followed the truck north on 6th Street. The truck was stopped at a red light at 6th and Linden Streets. An officer in a marked unit activated his siren, at which point the driver of the Honda ran the red light and drove north. At 6th and Turner Streets, the driver briefly

pulled over, but then turned right and proceeded east on Turner Street. While attempting to turn left on 5[th] Street, the driver lost control and came to a stop on the sidewalk at the northeast corner of 5th and Turner Streets. Police ordered the driver—later identified as [Appellant], Curtis Thomas—out of the vehicle and placed him into custody. There was a female juvenile passenger that was also taken into custody. A subsequent search of the truck revealed two cell phones, a shotgun, and shotgun shells. The shotgun had one spent shell in the chamber and four live shells in the magazine. One cell phone—a black Motorola in a blue case—was found on the driver's floor, turned on, and displaying a navigation application.

[Appellant] was taken to police headquarters and was interviewed after waiving his *Miranda*[1] rights. [Appellant] did not admit to shooting Mr. Hughes, but acknowledged it was his truck in the photo and that he was the only person that drove the truck that day. He also advised that there was a shotgun in the truck, which was his. Police ultimately obtained and executed a search warrant for the black Motorola cell phone. Text messages, videos, and photos were recovered from the phones. Many of the videos and photos depicted [Appellant].

Following an autopsy on Mr. Hughes, the cause of death was found to be a shotgun wound to the chest and the manner of death was ruled a homicide. Ballistics analysis of the shotgun and shells taken from [Appellant]'s truck determined they matched the ammunition type, gauge, pellet size, and manufacturer as the wadding and pellets retrieved from Mr. Hughes' body.

Trial Court Opinion ("TCO"), 8/5/19, at 2-4.

The Commonwealth charged Appellant with first-degree murder, 18 Pa.C.S. § 2502(a); fleeing or attempting to elude an officer, 18 Pa.C.S. § 906; and two counts of persons not to possess a firearm, 18 Pa.C.S. § 6105. Appellant filed motions to suppress 1) evidence obtained from the search of his cellphone and, 2) the statement he made to police while in custody. The

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

trial court conducted a suppression hearing on May 15, 2018. On August 17, 2018, the court filed an opinion and order denying the suppression motions. **See** Suppression Opinion ("SO"), 8/17/18, at 7 (determining that Appellant's **Mirandized** statement to police was voluntary), 10 (concluding that the warrant was not defective). On December 14, 2018, following a bifurcated trial, Appellant was convicted on all counts. The jury found him guilty of first-degree murder and fleeing or attempting to elude an officer, and the trial court found him guilty of both firearms offenses.

On January 22, 2019, the trial court sentenced Appellant to life imprisonment without the possibility of parole for first-degree murder, and to a consecutive term of 10-20 years' incarceration for persons not to possess a firearm. The court determined that the second firearm offense merged for sentencing purposes. Appellant filed timely post-sentence motions, which were denied on April 29, 2019, and he then filed a timely notice of appeal. Appellant filed a timely, court-ordered Pa.R.A.P. 1925(b) statement, and the trial court issued its Rule 1925(a) opinion on August 5, 2019.

Appellant now presents the following questions for our review:

A. Did the trial court err when it denied [Appellant]'s pretrial motion to suppress statements [he] made during an interrogation and following his receiving **Miranda** warnings[,] which [Appellant] believes were not knowingly, intelligently, and voluntarily waived?

B. Was the search warrant for the seizure and search of [Appellant]'s cell phone proper or was it overbroad and [did it] insufficiently set forth the evidence to be seized during the search?

C. Did the trial court erroneously permit the entry as evidence at trial of various text messages taken from [Appellant]'s cell phone when those text messages were not sufficiently authenticated as having been sent by [Appellant]?

D. Was the jury verdict supported by sufficient evidence to sustain the finding of [Appellant]'s guilt for the charge of [first-degree] murder … when [he] believes he was not adequately identified as the perpetrator of the homicide?

Appellant's Brief at 9-10 (unnecessary capitalization omitted).

Appellant's first two claims concern the suppression of evidence.

Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. [If] the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

***Commonwealth v. Jones***, 988 A.2d 649, 654 (Pa. 2010) (cleaned up).

## **Suppression – Appellant's Statement**

In his first claim, Appellant asserts that his statement to police should have been suppressed because it was not voluntarily, intelligently, and knowingly given. Appellant argues that there "was no indication that [he] was ever advised that the questioning would involve the alleged homicide. The detectives only spoke about the 'earlier accident' without clarifying that they

were referring to the alleged homicide of Mr. Hughes." Appellant's Brief at 19. It is undisputed that Appellant waived his *Miranda* rights before making his statement to police. Thus, Appellant asserts that his *Miranda* waiver was not knowingly and intelligently effectuated because he was ostensibly unaware of the reason he was being interrogated by police.

> In determining whether a defendant's waiver of his *Miranda* rights is valid, a trial court must consider: (1) whether the waiver was voluntary, in the sense that the waiver was not the result of governmental pressure; and (2) whether the waiver was knowing and intelligent, in the sense that it was made with full comprehension of both the nature of the right being abandoned and the consequence of that choice. The Commonwealth bears the burden of establishing that a defendant knowingly and voluntarily waived his *Miranda* rights. Factors to be considered in determining whether a waiver is valid and a confession is voluntary include: the duration and means of interrogation; the defendant's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and any other facts which may serve to drain one's powers of resistance to suggestion and coercion.

*Commonwealth v. Patterson*, 91 A.3d 55, 76 (Pa. 2014) (cleaned up).

In *Commonwealth v. Collins*, 259 A.2d 160 (Pa. 1969), our Supreme Court held that "an intelligent and understanding waiver of the right to counsel is impossible where the defendant has not been informed of the crime which is being investigated." *Id.* at 163. The Court further opined that "[i]t is a far different thing to forgo a lawyer where a traffic offense is involved than to waive counsel where first[-]degree murder is at stake." *Id.*

> When a defendant challenges the validity of his *Miranda* waiver on this basis, the Commonwealth must establish, by a preponderance of the evidence, that the defendant was aware of the reason for the interrogation. The Commonwealth can meet

this burden through evidence of the circumstances surrounding the interrogation, such as the fact that the interrogation follows hard upon the criminal episode and there is no circumstance lending ambiguity to the direction and purpose of the questioning.

*Commonwealth v. Johnson*, 160 A.3d 127, 138 (Pa. 2017) (cleaned up).

In rejecting this claim, the trial court reasoned that Appellant

was aware of the general nature of the interview, and there was no "palpable ambiguity" as to why the detectives were interviewing him. [*Commonwealth v.*] *Dixon*, 379 A.2d [553, 557 (Pa. 1977)]. [Appellant] stated he had just arrived in Allentown from D.C. that morning, so it would not be reasonable to believe Allentown Police were questioning him about some other matter; just two hours after the shooting, [Appellant] fled from police when they attempted to stop him; and the detectives interviewed him an hour later-just three hours after the shooting- and told him they wanted to talk about the accident earlier in the day. Additionally, [Appellant] had prior experience with *Miranda* warnings, appeared to understand everything the detectives were saying to him, and responded appropriately.

[Appellant] relies on … *Dixon* … to support his argument that [he] may have believed he was being questioned about driving his car off the road. However, the holding in *Dixon* hinged on the fact that Ms. Dixon was previously advised she would be arrested if she did not comply with a restitution order stemming from a prior conviction. Additionally, Ms. Dixon was questioned about three weeks after the incident and not "hard upon the criminal episode." *Id.* at 556. The same ambiguity does not exist in the case at hand. It would be illogical for [Appellant] to think he was stopped by police, ordered out of his vehicle with his hands up, arrested, brought to police headquarters, and interrogated for driving his car off the road.

On the facts of this case, I conclude that a preponderance of the evidence establishes that [Appellant] knew the "occasion for the interrogation" at the time he waived his rights. As such, suppression is not warranted.

SO at 6-7 (some citations omitted).

First, we agree with the trial court in rejecting Appellant's claim that this case is indistinguishable from **Dixon**. Appellant was arrested in close temporal proximity to the occurrence of the murder for which he was being questioned. **Dixon** was questioned several weeks after her victim's already-decomposed body had been discovered, suggesting even far more time had elapsed since the murder had occurred. **Dixon**, 379 A.2d at 554. When police attempted to stop Appellant's vehicle only two hours after the murder, he fled, and was forcibly detained while still in constructive possession of the murder weapon. Dixon, by contrast, voluntarily went to the police station without being told the reason why the police were interested in questioning her. **Id.** at 555. **Dixon** is clearly inapposite to the matter at hand.

Second, we acknowledge that the officers' initial use of the term "accident" *potentially* created ambiguity regarding the topic of the interrogation that followed Appellant's waiver of his **Miranda** rights, but only when viewed without regard to the other relevant circumstances surrounding the interrogation. Moreover, the Commonwealth's burden was only to show by a preponderance of the evidence that Appellant was aware of the reason he was being questioned. "A preponderance of the evidence is tantamount to a 'more likely than not' standard." **Commonwealth v. Esquilin**, 880 A.2d 523, 529 (Pa. 2005). Here, we ascertain no abuse of the trial court's discretion in its determination that a preponderance of the evidence demonstrated that Appellant must have been aware that he was being questioned for a murder,

and not for merely being involved in an accident. Accordingly, we conclude that Appellant's first claim lacks merit.

## Suppression – Cell Phone Search and Seizure

Next, Appellant argues that there was insufficient probable cause for the warrant issued to seize and search his cell phone, and/or that the warrant was overbroad in scope. First, he contends that the affidavit of probable cause in support of the warrant was "devoid of any reasonable supporting evidence that the phone was used or was otherwise an integral part of [Appellant's] actions in planning or committing the homicide." Appellant's Brief at 25.

> The legal principles applicable to a review of the sufficiency of probable cause affidavits are well settled. Before an issuing authority may issue a constitutionally valid search warrant, he or she must be furnished with information sufficient to persuade a reasonable person that probable cause exists to conduct a search. The standard for evaluating a search warrant is a totality of the circumstances test as set forth in *Illinois v. Gates*, 462 U.S. 213, … (1983), and adopted in *Commonwealth v. Gray*, … 503 A.2d 921 ([Pa.] 1985). A magistrate is to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him … there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Commonwealth v. Ryerson*, 817 A.2d 510, 513–14 (Pa. Super. 2003) (cleaned up).

> Here, the trial court determined that
>
> there was a substantial basis for a finding of probable cause for issuance of the search warrant. According to the search warrant application, a black Motorola cell phone was found on the driver's side floor where [Appellant] had been sitting, just hours after the shooting; the phone was unlocked, powered on, and displaying a navigation application; and the juvenile passenger in the vehicle

advised he/she was in phone contact with [Appellant] following the shooting. Considering all the information contained within the four corners of the affidavit, there was a fair probability that evidence relevant to the shooting would be found on [Appellant]'s cell phone. As such, a substantial basis existed for the issuing authority's finding of probable cause.

SO at 8-9.

We agree with the trial court. Because the phone was found in the vehicle identified by the witnesses a few hours after the shooting, there was a reasonable possibility that it might contain evidence relevant to the murder investigation. It does not require much imagination to believe a phone found in such circumstances might contain either inculpatory or exculpatory evidence, such as location data at the time of the crime, potential recordings of the incident itself or other events closely related to the murder, or communications between Appellant and other persons before and after the shooting, to name just a few possibilities. Appellant cites no authority for the proposition that there must be probable cause to believe the phone was directly used in the killing, rather than its merely providing some evidence related to the killing.

Appellant cites **Commonwealth v. Wright**, 99 A.3d 565 (Pa. Super. 2014), in support of his claim, but we find that case is distinguishable on the facts and by its procedural posture. In **Wright**, the defendant was accused by a witness of killing two victims. **Id.** at 567. When executing a warrant for his arrest, police claimed that after they discovered Wright in a state of undress in his bed, they chose a pair of pants for him to put on. **Id.** Inside those pants, they claimed to have discovered a cell phone, which they seized

incident to his arrest. *Id.* The suppression court did not find the officers' testimony credible, and instead believed Wright's mother's testimony, who indicated that the police had seized the phone from a table next to the bed. *Id.* at 568. The court then granted suppression, on the basis that the phone had not been seized incident to his arrest. This Court affirmed the suppression order, rejecting the Commonwealth's assertion that the even if not seized incident to Wright's arrest, the phone was seized in plain view and its criminal nature was "readily apparent." *Id.* at 569.

The instant case is distinguishable from *Wright*. First, *Wright* involved the Commonwealth's appeal after the trial court granted a suppression motion. Second, the phone at issue here was not seized under some general theory that cell phones are inherently incriminating, as had occurred in that case. Rather, the at-issue phone was discovered by police in a context where it was likely to aid in determining the location of Appellant and his vehicle at the time of the murder, especially given the fact that when discovered, the phone was observed running a navigation application. It was a reasonable inference that if the phone was in Appellant's possession when he was arrested in his vehicle, it was more probable than not that it was also in his possession at the time the murder occurred, and could therefore confirm his location at that time, or contain messages sent immediately before or after the killing. In either case, such information would be highly relevant to a criminal prosecution of Appellant. In *Wright*, there were no facts indicating Wright's possession of the phone immediately before or after the murders under

- 11 -

investigation in that matter; thus it was pure conjecture that the phone had any relevance to the murders under investigation. Accordingly, we conclude that there is no merit to Appellant's claim that there was insufficient probable cause for the magistrate to issue a warrant to search Appellant's phone.

Second, Appellant argues that the warrant to search his cell phone was overbroad because it permitted a search of essentially all applications and any data contained in the phone. Appellant's Brief at 27-28. The warrant granted a search of:

> All user generated data stored on the handset and/or SIM card - including user information, ring tones, audio files, e-mails, websites visited, all call logs (incoming & outgoing), information, Short message services (SMS) - including deleted messages, and Multi application (App) data used to communicate and/or to store data on the phone, flash storage [and a]ll data stored on a flash memory card from within the handset.

Search Warrant, 1/26/18, at 1.

> It is a fundamental rule of law that a warrant must name or describe with particularity the property to be seized and the person or place to be searched. The particularity requirement prohibits a warrant that is not particular enough and a warrant that is overbroad. These are two separate, though related, issues. A warrant unconstitutional for its lack of particularity authorizes a search in terms so ambiguous as to allow the executing officers to pick and choose among an individual's possessions to find which items to seize. This will result in the general rummaging banned by the Fourth Amendment. A warrant unconstitutional for its overbreadth authorizes in clear or specific terms the seizure of an entire set of items, or documents, many of which will prove unrelated to the crime under investigation. An overbroad warrant is unconstitutional because it authorizes a general search and seizure.

*Commonwealth v. Dougalewicz*, 113 A.3d 817, 827 (Pa. Super. 2015) (cleaned up).

Here, the trial court determined that the warrant was not overbroad, stating:

> [T]here was probable cause to believe [Appellant] was using his cell phone, including applications, before and after the shooting. The search warrant application makes clear that when dealing with computerized/digital information, it is common to require officers to seize most or all of the device's data in order to properly identify and extract the relevant evidence. Additionally, a user may try to conceal evidence on a digital device with deceptive file names or extensions, or by attempting to delete files. Under the circumstances, the description of the items to be search[ed] for and seized was as specific as reasonably possible. As such, the warrant was not overbroad and suppression is not warranted.

SO at 10.

Appellant nevertheless contends that he was subjected to a general search, because the warrant issued to search his phone "was as broad as possible." Appellant's Brief at 27. He complains that it requested "all application data stored either on the phone or in any flash memory or in cloud storage. It is hard to picture how the request could have been any more general in nature or all-encompassing." *Id.*

We disagree. The at-issue warrant permitted the search of a single electronic device, Appellant's cell phone; it did not permit a general search of multiple devices or a search of multiple locations. Appellant does not dispute that he possessed the phone, or his ownership thereof, before, during, and immediately after the shooting. We are aware of no controlling authorities

- 13 -

that suggest that the search of a single electronic device in similar circumstances is overbroad merely because of the quantity of information it potentially contains.

Other than a few cases cited for boilerplate case law, Appellant points to only one in support of his argument, this Court's decision in **Commonwealth v. Melvin**, 103 A.3d 1 (Pa. Super. 2014), and his analysis of that case is superficial at best. In **Melvin**, the defendant, a judge, was accused of misusing her public office for private gain by using her publicly-funded judicial staff to aid in her reelection campaign. **Id.** at 10. Pursuant to the investigation, a warrant was issued to search virtually all of her emails over a period of several years, from both her private and work email accounts. **Id.** at 17 n.7. Melvin's suppression motion only challenged the warrant with respect to her private email accounts. **Id.**

This Court held that the warrant was overbroad with respect to Melvin's private email accounts because,

> while the supporting affidavit provided probable cause that evidence of criminal activity could be found in emails in the account, it did not justify a search of every email therein, including those with no relation to criminal activity. Because the warrant permitted the seizure of every email in the account without any attempt to distinguish the potentially relevant emails from those unrelated to the investigation, it permitted a general search and seizure that was unconstitutionally overbroad.

**Id.** at 18–19 (borrowing the Court's analysis from a companion case).

However, **Melvin** did not involve a search of a single electronic device, and the unrestricted search of the email account most closely associated with

- 14 -

the criminal conduct at issue was not under review. For these reasons, we find **Melvin** inapposite.

Additionally, while probable cause existed to search the phone, it was not immediately obvious, nor could it be, what particular applications or functions would ultimately produce relevant evidence. Appellant's argument would suggest that a warrant issued to search for drugs in a car, supported by probable cause, must additionally specify where the drugs will be found in the car before it is searched in order to overcome the constitutional restriction on overbroad warrants. We reject such an interpretation of the overbreadth doctrine as practically unworkable. It is enough that probable cause existed to search the phone for evidence related to the murder, where the phone was in Appellant's possession when he was apprehended shortly after the murder, and it was reasonable to assume that it had been used immediately prior, during, and/or after the shooting. Accordingly, we conclude the trial court did not abuse its discretion when it denied Appellant's suppression motion on the basis that the warrant was not overbroad.

## Authentication

Next, Appellant argues that that the trial court erred when it admitted "the messages, videos, and photographs" from Appellant's phone without proper authentication. Appellant's Brief at 29.

> "Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." **In Interest of F.P.**, 878 A.2d 91, 94 (Pa. Super. 2005). Electronic communications, such as text messages, must be authenticated prior to their admission. **See**

***Commonwealth v. Koch***, 39 A.3d 996, 1002–03 (Pa. Super. 2011)…. "[P]roof of any circumstances which will support a finding that the writing is genuine will suffice to authenticate the writing." ***F.P.***, 878 A.2d at 94.

Under Pennsylvania Rule of Evidence 901, text messages may be authenticated by: (1) testimony from either the author or the sender; (2) circumstantial evidence, including "distinctive characteristics" like information specifying the author-sender or "reference to or correspondence with relevant events" preceding or following the message; or (3) "any other facts or aspects of the [message] that signify it to be what its proponent claims." ***Commonwealth v. Koch***, … 106 A.3d 705, 712–13 ([Pa.] 2014) (Castille, C.J., in support of affirmance); ***see Commonwealth v. Collins***, … 957 A.2d 237, 265–66 ([Pa.] 2008). Further, "[a]uthentication generally entails a relatively low burden of proof; in the words of Rule 901 itself, simply 'evidence sufficient to support a finding that the item is what the proponent claims.'" ***Koch***, 106 A.3d at 713 (quoting Pa.R.E. 901(a)).

***Commonwealth v. Murray***, 174 A.3d 1147, 1156–57 (Pa. Super. 2017).

Instantly, Appellant challenges the authentication of the following evidence obtained from his cellphone:

The prosecution's evidence taken from the phone included a text message sent on November 1, 2017[,] at 12:25 PM[,] in which the message sent from the phone to an individual known as "Billy Bad Azz" … stated "Gotta get another ride, had 2 dxgg a nigga this morning." There was also discovered an earlier text message sent on October 27, 2017[,] in which the sender used the word "Dxgg." Additionally, on October 19, 2017[,] [Appellant] filmed himself in a video during which he stated "... I found the nigga, I see him. He got a few of his little homies with him. I'm bout to run down on them niggas. No dogg, no nothing, I'm gonna show you niggas what's really good with me... I am definitely about to go walking through this m.f. man... I'm bout to get yo bitch ass."

Appellant's Brief at 29.

Appellant contends he

must … be, at [a] minimum, circumstantially tied to the authorship of the electronic messages or videos that the Commonwealth

- 16 -

wish[ed] to use especially the electronic message posted the day of the shooting for which the Commonwealth alleged [Appellant] had made an admission that he was involved in a shooting. The Commonwealth, at the time of the hearing for its Motion in Limine, sought to obtain the admission of the text and other materials from the phone by comparing the November 1[st] text message to an earlier text message in which the same "word" appeared. That word, "Dxgg" was, according to the Commonwealth, enough to show that [Appellant] authored both messages and that they had properly authenticated those same messages. This authentication, if permitted, allows Rule 901 to be validated through the application of one anonymous text message to verify a second anonymous text message. The Commonwealth failed to present an adequate level of authentication for either text message showing that it was [Appellant] who authored the messages. There appeared to be no showing by any other direct or circumstantial evidence that [Appellant] had authored the second message or that other individuals had been [eli]minated from the possible use of that phone in the creation of one or both of the text messages.

*Id.* at 32-33. We disagree.

First, we note that Appellant fails to develop his argument with respect to the videos. Thus, that aspect of his claim is waived.[2] As to the text

---

[2] "The Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority." ***Estate of Haiko v. McGinley***, 799 A.2d 155, 161 (Pa. Super. 2002); ***see also*** Pa.R.A.P. 2119(b). "Appellate arguments which fail to adhere to these rules may be considered waived, and arguments which are not appropriately developed are waived. Arguments not appropriately developed include those where the party has failed to cite any authority in support of a contention." ***Lackner v. Glosser***, 892 A.2d 21, 29–30 (Pa. Super. 2006) (citations omitted). This Court will not act as counsel and will not develop arguments on behalf of an appellant. ***Irwin Union National Bank and Trust Company v. Famous and Famous and ATL Ventures***, 4 A.3d 1099, 1103 (Pa. Super. 2010) (citing ***Commonwealth v. Hardy***, 918 A.2d 766, 771 (Pa. Super. 2007)).

messages, we agree with the Commonwealth's analysis that the text messages were sufficiently authenticated by ample circumstantial evidence.

The Commonwealth stated:

Here, the prosecutor provided the lower court with a sufficient foundation that authenticated the text messages:

- At 11:54 am on November 1, 2017, the victim is shot and killed.

- Two independent witnesses describe the shooter and his vehicle. Their descriptions match [Appellant] and the vehicle he was driving when he is subsequently arrested - a maroon Honda Ridgeline.

- Four minutes prior to the shooting, at 11:50 am, surveillance video captures a maroon Honda Ridgeline with a front license plate travelling south across the 8th Street bridge in Allentown. There is a horizontal white sticker on the rear window of the vehicle.

- Two minutes later, at 11:52 am, surveillance video captured a maroon Honda Ridgeline with a horizontal white sticker on the rear window in the immediate vicinity of South 9th Street and Wyoming Street, which is the scene of the shooting.

- [Appellant] identified the vehicle on the surveillance video as his.

- Approximately 2 hours later, at 2:07 pm, Allentown Assistant Police Chief Gail Struss located a maroon Honda Ridgeline with a white sticker on its rear window in the area of North 6th Street and W. Walnut Street in Allentown. When she attempted to stop the vehicle, it fled and subsequently crashed in the area of 5th and Turner Streets. [Appellant] is the driver.

---

In any event, had Appellant not waived this aspect of his claim, we would still find it meritless for the same reason we reject his claim that the text messages were not properly authenticated, as discussed, *infra*.

- 18 -

- Detective John Brixius arrives at the scene immediately thereafter. As [Appellant] is being escorted from the Ridgeline, he observes a cell phone on the driver side floor boards of the Ridgeline, where [Appellant] had been sitting. The cell phone is powered on and actively running a "Waze" navigation app.

- As [Appellant] is escorted by police away from the Honda Ridgeline accident, he tells police that the girl in the passenger seat was not with him, he just picked her up at McDonald's. He then asks police for his phone, which was still in the Ridgeline.

- During his interview, [Appellant] claims that he is from Washington[,] D.C., and travelled to Allentown around 8:00 am that morning. He also tells police he was alone all day.

- [Appellant] further tells police the he has 2 cell phones in his Ridgeline. When shown the 2 phones recovered from the Ridgeline, [Appellant] confirms that both of them are his and provides police with the phone numbers associated to each.

- [Appellant] reiterated that the female in his car at the time of his arrest, was not in the car until approximately 5 minutes prior - *i.e.*, 2:02 pm.

- Approximately 30 minutes after the shooting, at 12:25 pm, a text message is sent from [Appellant]'s phone to an individual identified in [Appellant]'s contact list on the phone as "Billy Bad Azz." This individual has a 202 area code, which is the area code for Washington[,] D.C., where [Appellant] claims to live.

- The text message sent from [Appellant]'s phone states, "Gotta get another ride, had 2 dxgg a nigga this morning."

- Also on [Appellant]'s phone was a text message from his phone to "Ace Buggie" stat[ing], "you get that dxgg." This message was sent on October 27, 2017, five days prior to the shooting.

- "Ace Buggie" responded to the text from [Appellant]'s phone, "My brother ain't answer all day I think my father got one for me but I have to pull up on him no talk over the phone at all."

- On October 19, 2017, [Appellant] filmed himself with his phone. In the video is [Appellant] alone in his vehicle a[n]d he states: "I found the nigga, I see him. He got a few of his little homies with him. I'm bout to run down on them niggas. No dog, do nothing. I'm gonna show you nigga's what's really good with me ... I'm definitely bout to go walking through this mother fucker man ... I'm bout to get yo bitch ass."

- There are approximately 70 more similar videos [Appellant] took of himself saved on defendant's phone.

- Police also found hundreds of images that were "selfies" of [Appellant] on his phone.

N.T.[,] 12/4/18, [at] 37-39, 48-51, 61-64. **_See also_** Commonwealth's Memo –Text Message Authentication, 12/7/18, attached hereto as Exhibit A.

Based on the totality of the circumstances set forth above[,] particularly the temporal proximity between the text message in question and the time of the shooting (31 minutes), the proximity of [Appellant] at the time of the text to the scene of the crime, [Appellant]'s assertion of ownership and use of that phone within 2 hours of the shooting, and the lack of another person in [Appellant]'s vehicle at the time of the text message – the electronic communication was sufficiently authenticated. As such, the lower court properly admitted it as evidence.

Commonwealth's Brief at 20-22.

The facts, collectively, more than adequately authenticated that the at-issue content on Appellant's cell phone was written by him. Appellant admitted that it was his phone, and verified the correct phone number. The timing of the later-in-time text message was temporally connected to the homicide. The prior message was to the same number and contact name in Appellant's contact list. Numerous images and videos on the phone depicted Appellant. We ascertain no abuse of discretion in the trial court's determining

that "the Commonwealth sufficiently authenticated" the text messages. TCO at 6.

## Sufficiency of the Evidence

Finally, Appellant challenges the sufficiency of the evidence supporting his conviction for first-degree murder. Specifically, he contends that the evidence was insufficient to prove his identity, due to inconsistencies in the testimony of the eyewitnesses. Appellant's Brief at 35-36. This argument is meritless.

> A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted).

> In reviewing the sufficiency of the identification evidence, we note that, even though vague, tenuous and uncertain identifications standing alone are insufficient, our courts have held that evidence of identification needn't be positive and certain in order to convict, although any indefiniteness and uncertainty in the identification testimony goes to its weight. Similarly, although identification based solely on common items of clothing and general physical characteristics is insufficient to support a conviction, such evidence may be considered to establish identity along with other circumstances and the proffered identification testimony.

*Commonwealth v. Minnis*, 458 A.2d 231, 233 (Pa. Super. 1983) (cleaned up).

> Here,
>
> [t]wo witnesses gave descriptions of the shooter, the shotgun, and the vehicle the shooter was driving; video footage from the area of the shooting captured the vehicle described; police pulled a matching vehicle over approximately two hours after the shooting; [Appellant] was driving the vehicle and matched the description of the shooter; a shotgun and shotgun shells were found in the vehicle; and ballistics connected the gun and shells to the projectile recovered from the victim.
>
> Accepting as true this evidence, as well as any reasonable inferences arising from it, it was sufficient in law to prove beyond a reasonable doubt that [Appellant] is guilty of the crimes for which he was convicted.

TCO at 7.

These collective circumstances were more than sufficient to identify Appellant as the shooter. Any discrepancies in the evidence went to the weight, not the sufficiency of that evidence.[3] In any event, the trial court noted that "the description[s] given by the witnesses were very similar. Both described a black male wearing a black hoodie and driving a purple truck." *Id.* at 7. Although those descriptions were not precise (as the eyewitnesses viewed the shooting from a distance), Appellant's identity was further corroborated by the circumstances of his arrest. Two hours after the shooting, Appellant fled from police in a vehicle matching the eyewitnesses' testimony, and in which the murder weapon was ultimately discovered. Additionally, the

_____

[3] Appellant raised a weight claim in his Rule 1925(b) statement, but abandoned it in his brief. Accordingly, that claim is waived.

- 22 -

evidence contained in Appellant's cell phone tended to corroborate his identity as the shooter. Accordingly, we conclude that there is no merit to Appellant's claim that the evidence was insufficient to establish his identity.

Judgment of sentence **affirmed**.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/27/20